# IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TENNESSEE
### AT KNOXVILLE

| | | |
|---|---|---|
| DOYLE MYNATT, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 3:06-CV-43 |
| | ) | (Phillips) |
| LOCKHEED MARTIN ENERGY SYSTEMS, INC., | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

Plaintiff Doyle Mynatt has sued his former employer, Lockheed Martin Energy Systems, Inc. (LMES), alleging racial discrimination in employment through discriminatory selection, promotion, compensation, and disciplinary policies, practices and procedures, discriminatory terms and conditions of employment, and the existence and perpetuation of a racially hostile work environment in violation of 42 U.S.C. § 2000e, *et seq.,* (Title VII) and 42 U.S.C. § 1981 as amended.  He also alleges that because of his race he was wrongfully selected for layoff in 1999, wrongfully required to turn in his security badge, and wrongfully had his picture posted at portals with instructions not to allow him on the premises. Defendant LMES has moved for summary judgment asserting that there are no genuine issues as to material facts, and that LMES is entitled to judgment as a matter of law on all of plaintiff's claims.  For the reasons which follow, defendant's motion for summary judgment will be granted, and this action will be dismissed.

**Factual Background**

Beginning April 1, 1984, pursuant to a contract with the Department of Energy (DOE), LMES managed, operated and maintained the Y-12 facility in Oak Ridge, Tennessee. LMES' contract for operating the Y-12 facility ended on October 31, 2000, and BWXT assumed management and operation on November 1, 2000. Mynatt, an African-American male was employed by LMES and the predecessor government contractors at Y-12 from 1980 until his termination as part of a reduction in force in November 1999.

Prior to coming to work at Y-12, Mynatt had earned a bachelor's degree in Communications from the University of Tennessee, then spent approximately eighteen months working for radio stations and as a TV reporter. Mynatt started as a uniformed Security Inspector at Y-12. After two years, he was awarded a position of Material Dispatcher in the Weapons Material Management Department. In 1984, he became a Video Aide in the Video Department of the Public Relations Division. In 1985, he was promoted to Video Associate. While he held this position, Mynatt served as assistant to Mike Shepherd, then a Producer/Director. Shepherd later became supervisor of the department. In 1990, Mynatt was promoted to the position of Producer/Director. In that position, he produced and directed videotaped programs for the DOE facilities at Oak Ridge. He remained in that position until his termination in November 1999.

-2-

<u>Promotion</u>

Mynatt alleges that in 1994, a department head position became available, but the position was not posted by LMES. John Ridley, a white male employee from a different department, filled the opening. As of February 1993, Ridley was manager of Photography and Mike Shepherd was manager of Video. Both positions were then in the Graphics Division. At the time, LMES was making a series of rotation moves. The Graphics Division utilized a rotation process to have Ridley and Shepherd exchange positions. Each had some background in the work of the other and the purpose of the exchange was to "broaden the base" and expand the knowledge of the two section leaders. These were considered lateral moves by LMES, and posting of the position was not required.

In 1995, Shepherd was promoted and became Manager over the Video and Photography departments. Ridley remained Supervisor of Video and reported to Shepherd. Mynatt alleges that in 1998 the Head of the Video Teleconferencing position became available but was not posted and was filled by a white employee with less education. LMES states that there was not a position known as Head of Video Teleconferencing. Prior to 1998 the IMS department was asked to provide this service and it started to do so. John Buck, a Producer/Director, had some background in the work and volunteered for it in the late 1980's. By 1998 there had been a growth in the volume of the work to the point Buck spent approximately 60 percent of his time on teleconferencing and 25 percent of his time on traditional video work of the kind done by Mynatt. There did not come a time when a

-3-

position known as Head of Video Teleconferencing existed. There was never a "vacancy" for LMES to post. Buck became proficient in the work as it grew and he continued to do it as a part of his classification as Producer/Director. Because of his success with teleconferencing, he was elevated to Salary Grade 5. Mynatt was cross-trained to perform teleconference duties should the need arise.

Pay Discrimination

Mynatt alleges that he was discriminated against in his compensation, as Walter Corey, a white Producer/Director was paid more than him. Corey came to the Video Department in 1981. He became a Salary Grade 3 employee in 1986 and a Producer/Director in 1989, also a Salary Grade 3 position. Mynatt came to the Video Department in 1984 in a weekly salary position. He became a Salary Grade 1 employee in 1989. In 1990, he became a Producer/Director, at Salary Grade 3.

Salary increases at LMES were initially determined by the Compensation Department, a central office. Increases were determined by the Compensation Department on the basis of three factors: (1) the funds available for increases; (2) the employee's performance evaluations; and (3) the position of the employee within the salary rate range for the position held. The Compensation Department would inform the employee's management of its determination. Management had the discretion to change the increase slightly based on specific performance factors or leave it as made by the Compensation Department.

-4-

The first year that Corey and Mynatt held the same position (Producer/Director) was 1990. Their respective monthly salaries and performance evaluations from 1990 to 1999 are as follows:

|      | Corey  |      |       |      | Mynatt |      |        |
|------|--------|------|-------|------|--------|------|--------|
| 1990 | $2898  | CX   | 5.69% |      | $2432  | CM   | 13.13% |
| 1991 | $3057  | CS   | 5.48% |      | $2530  | CM   | 4.02%  |
| 1992 | $3197  | CS   | 4.57% |      | $2790  | CM   | 10.6%  |
| 1993 | $3299  | CM   | 3.19% |      | $2935  | CX   | 4.97%  |
| 1994 | ------ | DPPR | ----- |      | ------ | DPPR | -----  |
| 1995 | $3480  | DPPR | 5.48% |      | $3067  | DPPR | 4.99%  |
| 1996 | $3591  | CX   | 3.18% |      | $3184  | CM   | 3.81%  |
| 1997 | $3681  | CM   | 2.50% |      | $3267  | CM   | 2.60%  |
| 1998 | $3780  | CX   | 2.68% |      | $3362  | CM   | 2.90%  |
| 1999 | $3966  | CM   | 4.92% |      | $3580  | CM   | 6.48%  |

As shown above, the difference in the salaries of Corey and Mynatt narrowed during the period shown. In 1990, the difference was $466 per month. In 1999, it was $386 per month. In six of the nine years, Mynatt's percentage increase was greater than that of Corey, including his last four years under Ridley's supervision.

Ridley was aware that Corey made more money than Mynatt, but explained that Corey "had been at it a lot longer" than Mynatt and his experience predated his employment with LMES. Ridley also pointed to Corey's work with classified videotapes and his attention to detail in handling that information. Ridley testified that Corey "was a good producer and very competent in what he did, very conscientious, very eager to please the customer, did what he had to do to get the job done." Ridley reviewed the determinations made by the Compensation Department for both Corey and Mynatt and made no change

-5-

in the determination. Shepherd's recollection was that neither he nor Donna Griffith, the IMS division head, made any changes.

Hostile Work Environment

Mynatt alleges he was subjected to a racially hostile work environment tolerated and encouraged by LMES' supervisors and managers. During Mynatt's employment in the Video Department he had three direct supervisors. He also worked with other non-supervisory employees in the department. His supervisors were Robert Wesley, Mike Shepherd and John Ridley. He makes no allegations of discrimination by Wesley or Shepherd. Mynatt thought Wesley was excessively "under the thumb" as a manager, but he acknowledged that Wesley treated all employees that way. Mynatt said he had differences of opinion with Shepherd on the composition and editing of projects, but that he had no personal problems with him, that his relationship "was satisfactory."

Mynatt had a different view of Ridley as a supervisor and his relationship with him. He testified that he "dealt with Ridley on a professional level recognizing his position and his authority in that position. We had differences in terms of the craft itself, and because of those differences, it somewhat put a strain on our relationship within the department." Asked if Ridley treated him respectfully he said, "He did not manage me outside the realm of proper procedure."

-6-

Mynatt stated that he took offense to a Christmas card he had been given by Ridley that depicted an orangutan and the language, "hang in there." Ridley was asked about it. He said he had no knowledge of the card; that the only cards exchanged with staff were birthday cards signed by everyone.

Later in his deposition, Mynatt stated the differences with Ridley in stronger terms. Mynatt testified that everything he did was "criticized to the point were it was demeaned." Asked if he had ever had an argument with Ridley of a serious or harsh nature, Mynatt testified that they had arguments in terms of differences in the way he did things on the set that was different from Ridley. He felt that Ridley tried to impose his ideology and philosophy of how to do certain things on him, and they had arguments about those things. Mynatt stated that it was not personal, it never went beyond the realm of discussion.

Mynatt testified about an incident in the early 1990s in which he videotaped a scene at a low angle with a woman in a short dress. Mynatt thought it was nothing more than one saw on network television. Ridley thought it was not appropriate and had it redone. Mynatt was gone for a week on training at the time the scene was redone. Mynatt spoke to Ridley upon his return and expressed his disagreement with the decision to redo the scene. Mynatt was offended that it was done while he was absent without prior discussion with him. Ridley felt that the scene was not appropriate and he faced a deadline to complete the project, so he did not consult with Mynatt prior to redoing the scene.

-7-

Another matter involved Mynatt's work schedule. Mynatt was a Salary Level 3 and thus an "exempt" employee under the Fair Labor Standards Act. Mynatt felt this entitled him to work a flexible schedule. Ridley, however, felt that Mynatt was not working a full 8-hour day or 40 hours per week. Ridley spoke to Mynatt about the matter and Mynatt complied with his instructions.

Another incident occurred in 1995 when the Project Director at ORNL called Ridley to request that Mynatt be removed from a project because he was absent often and the crew was doing all the work. After reviewing the matter with the crew and Mynatt, Ridley removed Mynatt from the project. Ridley was asked if Mynatt was a "good producer." Ridley said he was and went on to say, "Some projects I felt like he managed well and some projects he did not. I feel like he could have done better on some projects, maybe poor judgment on some, and some he completed well."

Another incident occurred on a project at K-25. Mynatt and a videographer/editor went to K-25. Mynatt left and the videographer was left with assembling the equipment, doing the shot, and then taking down the equipment. At another project at K-25, in an argument with a crew member in the presence of the customer, Mynatt threw the script at the crew member. Mynatt acknowledged to Ridley that he had acted unprofessionally and he apologized to the crew member. Mynatt testified with respect to these incidents, that the crew was attempting to undermine his authority.

-8-

Ridley evaluated Mynatt as "consistently meets" job requirements.  Moreover, the evaluations contain positive remarks: "Has a good understanding of what it takes to produce a video program," and "Has met his customer's expectations."

Reduction in Force

On September 8, 1999, Mynatt and other IMS employees were notified they had been selected for layoff, effective November 12, 1999.  In 1993, IMS had 520 employees and 150 contract employees.  In 1999, by attrition, layoffs, and the reduction of contract employees, it had approximately 100.  IMS laid off 85 employees during 1999. The layoff process commenced with the company's finance organization notifying employment units, such as IMS, of how the budget would impact them, and the extent to which the unit would need to reduce its work force.  In the final reduction in force (RIF), 8 employees were to be laid off. The selection process and review were done in accordance with established LMES policy that required the determination of peer groups.   The composition and selection for layoff of an employee or employees with the peer groups was based on six criteria established by company policy.  The criteria were: possession of critical/essential skills; length of service; performance reviews; transferability of skills; job-related education/training; and time in current position.  The policy contemplated an initial selection by the employing unit with review by the RIF Review Board, which consisted of Human Resources, Workforce Diversity, and a final review by the Legal Department and the Head of Human Resources.

Two employees of the Video Department were to be among those to be laid off, one a Producer/Director and the other a Video Assistant. The decisions were based on the decline in work for Producers/Directors. A peer group for Producers/Directors was established. That group consisted of Corey and Mynatt, both in Salary Grade 3. John Buck was not included because he was in Salary Grade 5, and his work had evolved largely into video teleconferencing.

Once the peer group was established for Producer/Director, the individual selection was made. The selection was made in meetings of Donna Griffith, Mike Shepherd and John Ridley. In the process, performance evaluations were reviewed. Ridley said he was asked for information but not his opinion on who was to be selected. Mynatt was selected for layoff. Of the two, the selection committee found Corey was the more experienced. He had developed a strong customer base at Y-12, whereas Mynatt's work, which had developed more at K-25 had declined despite efforts to retain the business after Bechtel Jacobs had taken over at K-25. Corey was considered the superior employee. Shepherd, who had worked with both as a supervisor stated:

> In truth, Mr. Corey had and still has higher technical skills. Mr. Corey, in effect, became the facility's chief engineer, as it were, a position that I used to do to keep equipment going, to make sure the color phase was correct, to make sure that the maintenance was done on the equipment, all of those types of things that equal opportunities were presented to Mr. Mynatt. Mr. Corey embraced those. Mr. Mynatt did not. So if I understand your question about uniqueness, Mr. Corey did have some unique skills that Mr. Mynatt did not have that were germane to the entire scope of the work.

-10-

Shepherd also noted Corey's work in direct weapons support at Y-12 and classified work that was ongoing. He stated that Mynatt had been given the opportunity to do the work, but made known that he preferred to do what he was doing. He told Shepherd that weapons work "was mindless and not creative and didn't fit his skills."

After the internal selection was made, the matter was presented to the RIF Review Board by Griffith and Shepherd. The Layoff Comparison Form shows the following with respect to the two individuals in the peer group – Corey and Mynatt, their performance ratings, time in position, years of service, age, race, sex, and education. The form also contained a statement justifying why Mynatt was selected for layoff:

> Loss of work form Bechtel Jacobs work authorizations and decreased funding from Defense Programs necessitates reducing the number of personnel in this function. When compared with peers, depth and breadth of skills is not as great despite being provided with opportunities. Candidate has not demonstrated initiative to work beyond the requirements of the job when compared with peers.

Mynatt's selection was approved by the six member board and was thereafter approved by the Legal Department and the Head of Human Resources.

Threat Assessment Team

In response to the possibility of incidents of unexpected violence in the work place, LMES established a Threat Assessment Team (TAT). By a video shown to all employees, LMES made employees aware of the potential problem and notified them that the best protection against internal violence is to report all threats or behaviors that one

believed could lead to an outburst. On August 31, 1999, John Buck sent Dr. Howard

Friedman, the company psychologist and Chairman of the TAT the following email:

> The supervisor in our group has the potential of laying off one or more of the members of our small department. I've had a chance to review the potential list and note that the most likely person to be impacted is someone that has threatened several people in our department. (Myself included) I believe I have a real concern that if this person if impacted he may turn violent.
>
> A little background: this person came to our department from the guard department ... likes to shoot guns and has made it known to all that he has a gun permit to carry a gun. This individual owns several guns, one of which is a semi-automatic. This individual also knows enough about how the guard department operates to be able to circumvent our physical protection. This individual has an explosive personality that runs hot and cold. Our entire department walks on eggshells whenever he enters a conversation or we need to work with him. His behavior has been documented for years by our supervision, yet he is smart enough to skirt getting fired.
>
> I hope that this is all just an unnatural fear; however I believe that our supervisor might need some type of session to tell him how to deal with our coworker if he does get violent. What can we do to protect ourselves (besides taking the next two years off)?

Buck did not discuss the matter with anyone before sending the email.


On September 1, Buck notified Dr. Friedman that he had copied Ridley and

Shepherd on the email. In a cover email to them, he repeated his concern, saying (without

using a name), "When the layoff slips are handed out, we have one effected person that

is very likely to go out of control."

-12-

Soon after receiving the first email, Dr. Friedman called Buck and questioned him. Buck related an incident that occurred in the mid-1980s. His job then included answering the phone. In a call from Mynatt's wife, he kidded her wanting to know if it was his wife or girlfriend. Later that day, Mynatt took Buck by the arm, led him outside, and despite Buck's apology, screamed at him saying, "I will get you back. You won't know when and where it's gonna happen, but I will get you back." Buck also told Dr. Friedman of similar remarks Mynatt made to employees Bill Parham and Lewis Hinton.

Dr. Friedman met with Griffith, Shepherd and Ridley on September 3. They informed Dr. Friedman they were not aware of the basis for the degree of Buck's concerns. Dr. Friedman discussed workplace violence with them. He told them he would discuss the possibility of removing Mynatt's access to the secured area with Charles Miner, Head of Labor Relations, and Mike Sullivan, Head of Security, both members of the TAT. He suggested that Griffith discuss the plan with company officials.

Dr. Friedman discussed the matter with Miner and it was decided that Mynatt's access to the plant should be denied. Dr. Friedman felt there was a "potential" for violence, and he needed security inspectors involved. Dr. Friedman notified Shepherd and Griffith later on September 3 that, assuming the company approved the denial of access, access would be denied following the notice of layoff. Dr. Friedman also instructed Shepherd to have security inspectors present outside the meeting and to have Mynatt go from the notice meeting to his office.

-13-

On September 8, following approval by the RIF Review Board of Mynatt's selection, Griffith notified company officials of the plan. It was approved with instructions to inform Mynatt that a concern had been made. That afternoon, Griffith and Shepherd met with Mynatt and notified him of his layoff. Griffith told him of the budget reasons for the layoff; that concerns had been expressed as to how he might react; that for the next sixty days he was to be assigned to the company's Career Center; that he should take advantage of the opportunity to find other employment; and that he should go directly to Dr. Friedman's office.

Security inspectors were present outside the meeting and escorted Mynatt to Dr. Friedman's office. Dr. Friedman discussed the matter with him. He took Mynatt's security badge and instructed him to go to the Career Center which was outside the secured area. Mynatt was then escorted to the Career Center by security personnel. Dr. Friedman notified the Plant Shift Superintendent that Mynatt's access to the plant was being denied. The Superintendent had Mynatt's access badge removed from the system, and in accordance with LMES policy, had Mynatt's photograph posted at perimeter portals.

LMES has moved for summary judgment asserting that (1) the undisputed evidence fails to establish a racially hostile work environment; (2) Mynatt's reduction in force claim fails as a matter of law; and (3) with respect to removal of his right of access, Mynatt cannot establish a claim of discrimination based on race.

-14-

Plaintiff Doyle Mynatt has responded in opposition, stating that the evidence in this case demonstrates that he was subjected to a hostile work environment, and discriminatory terms and conditions of employment, thus precluding summary judgment in favor of LMES.

## Summary Judgment Standard

Summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In ruling on a motion for summary judgment, the court views the evidence, all facts, and any inferences that may be drawn from the facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986). To withstand summary judgment, the non-movant must show sufficient evidence to create a genuine issue of material fact. *Klepper v. First Am. Bank,* 916 F.2d 337, 342 (6th Cir. 1990). A mere scintilla of evidence is insufficient; there must be evidence on which the jury could reasonably find for the non-movant. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252 (1986). Entry of summary judgment is appropriate "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986).

-15-

**Analysis**

LMES moves for summary judgment on the grounds that (1) the undisputed evidence does not establish a basis for Mynatt's claim of a hostile work environment; (2) that the decision to include him in the reduction in force was based entirely on budget driven, legitimate business related non-discriminatory reasons that were justified and not pretextual; and (3) that his separation was done in accordance with the non-discriminatory policies and practices of the TAT and Shift Superintendent's office. Mynatt has voluntarily withdrawn his claims for failure to promote to manager of the Video Department, and for a position as head of video conferencing in the department.

Hostile Work Environment

Mynatt asserts he was subjected to a hostile work environment during his employment at LMES. In the Sixth Circuit, claims under 42 U.S.C. § 1981 require the same standard of proof to establish a *prima facie* case as a Title VII claim. *Newman v. Federal Express Corp.,* 226 F.3d 401, 406 (6th Cir. 2001). Title VII prohibits racial harassment that creates a hostile or abusive workplace. *Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 21 (1993); *Newman v. Federal Express Corp.,* 266 F.3d 401, 405 (6th Cir. 2001); *Hafford v. Seidner,* 183 F.3d 506, 512 (6th Cir. 1999). Under Title VII, a plaintiff establishes a *prima facie* case of hostile work environment based on race by demonstrating the following five elements: (1) he was a member of a protected class; (2) he was subjected to unwelcomed racial harassment; (3) the harassment was based on race; (4) the harassment had the effect of unreasonably interfering with plaintiff's work performance by creating an

-16-

intimidating, hostile, or offensive work environment; and (5) the employer was liable for the harassment. *Hafford,* 183 F.3d at 512.

A hostile work environment occurs "when the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris,* 510 U.S. at 21. In determining whether there was a hostile work environment, courts look to the "totality of the circumstances." *Faragher v. City of Boca Raton,* 524 U.S. 775, 787-88 (1998). "The conduct must be severe enough or pervasive enough to create an environment that a reasonable person would find hostile or abusive." *Bowman v. Shawnee State Univ.,* 220 F.3d 456, 463 (6th Cir. 2000). Appropriate factors for the court to consider when determining whether conduct is severe or pervasive enough to constitute a hostile work environment "include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* quoting *Harris,* 510 U.S. at 23. The Supreme Court has consistently held that "simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Newman,* 266 F.3d at 405, quoting *Faragher,* 524 U.S. at 788.

Mynatt lists several incidents of alleged racial harassment and discrimination during his employment with LMES. First, in 1998 his supervisor, Ridley gave him an

offensive card depicting an orangutan. Mynatt contends that Ridley's attendance at Bob Jones University lends credence to the possibility that he might act in a hostile manner toward African-Americans under his supervision, and his actions might be reasonably so construed by an African-American employee. Mynatt also states that his coworker, Corey, frequently wore a belt buckle with a Confederate flag on it. Additionally, on a number of occasions, Ridley was aware of, but took no action to address, Mynatt's complaints of Video Department staff and coworkers undermining his authority or refusing to follow his instructions.

Mynatt's proffered evidence fails to establish a *prima facie* case of a hostile work environment. The incidents relied upon by Mynatt were spread out over a period of approximately ten years and cumulatively do not support his allegation of a racially hostile work environment. The only two incidents which could be construed to have racial overtones – the orangutan card and the Confederate belt buckle worn by Corey, are insufficient, without more, to establish a hostile work environment. Mynatt also testified that he had problems with his supervisor, Ridley, and Ridley saw problems with some, but not all of Mynatt's work. As Mynatt's supervisor, Ridley was entitled to suggest or even direct changes in Mynatt's work. Moreover, there is nothing in the record that injects anything racial into the other workplace incidents of which Mynatt complains. Mynatt's complaints repeatedly involved disagreements over how work was performed and never expressly or by implication did it involve his race. There is nothing in what he complains of that was pervasive and both objectively and subjectively offensive.

-18-

Mynatt's case consists mainly of a conglomeration of incidents most of which are racially neutral. To infer racial hostility from the record in this case would permit a finding that there is racial hostility whenever there is professional disagreement on how something is to be done. Viewing these incidents collectively, the court fails to detect any racial animus behind the actions and further finds the incidents complained of do not rise to the "threatening" or "humiliating" level of severe conduct required to create an objectively hostile or abusive work environment under Title VII. Accordingly, LMES is entitled to summary judgment on Mynatt's hostile work environment claim.

Reduction In Force

Mynatt avers he was selected for the RIF based upon his race. To establish a *prima facie* case of discriminatory discharge, Mynatt must establish: (1) that he is in a protected class; (2) that he was discharged; (3) that he was qualified for the job; and (4) that a similarly-situated person who was not in the plaintiff's protected class received the job. *Seay v. Tennessee Valley Auth.,* 339 F.3d 454, 463 (6th Cir. 2003). In a RIF case, the fourth element is modified and the plaintiff must submit "additional direct, circumstantial, or statistical evidence tending to indicate that the employer singled out the plaintiff for discharge for impermissible reasons." *Rowan v. Lockheed Martin Energy Systems, Inc.,* 360 F.3d 544, 548 (6th Cir. 2004).

Mynatt asserts that John Buck should have been considered for the RIF, but was not. Buck had the same job title and the same duties. In addition, Mynatt asserts that

-19-

even though Corey had more experience, he was unable to grasp the fundamentals of critical technologies such as the AVID editing system. Mynatt argues this issue would be precisely the sort of consideration that ought to have been discussed under the six-factor RIF analysis. Mynatt contends this evidence indicates that LMES singled him out for the RIF for impermissible reasons.

It is undisputed that Mynatt has established the first three elements of the *prima facie* case. Because he was terminated in an economically-motivated RIF, the fourth element requires him to present additional direct, circumstantial or statistical evidence tending to indicate that LMES singled him out for impermissible reasons. Mynatt has failed to present any evidence that his RIF selection was made because of his race. Nor has he shown that LMES' articulated reasons for selecting him for the RIF were pretextual. The end of the Cold War led to significant budgetary cutbacks at Y-12 and other DOE facilities. The budget cutbacks adversely affected most of the departments at Y-12, including IMS. That IMS had to lay off personnel for budget reasons is not disputed by the parties; only the selection of Mynatt is in dispute.

Mynatt was a Media Producer II at the time of the RIF. The record shows that in accordance with RIF guidelines, Mynatt was placed in a peer group with Corey, who was also a Media Producer II. The layoff comparison form demonstrates that Corey's 1998 performance rating was higher than Mynatt's; he had worked in the position three years longer than Mynatt; and his work skills and experience were superior to Mynatt's.

-20-

Mynatt argues that Buck should have been included in the peer group from which the RIF selection was made. Although Buck had the same job title, he spent 60 percent of his time on video teleconferencing, a program he had developed. He also had become a Salary Grade 5 employee. For these reasons, he was not included in the Corey/Mynatt peer group. Shepherd testified that peer groups included personnel who had the same job function and the same salary grade level. Mynatt and Corey were the only two in the Video Department who were Salary Grade 3. Thus, Buck's work was not similar to that of Corey and Mynatt. *See Messner v. Lockheed Martin Energy Systems, Inc.,* 126 F.Supp.2d 502 (E.D.Tenn. 2000) (holding engineers doing different work with different salary grades were not peers for RIF purposes).

Mynatt further argues that Corey should have been selected for the RIF because he was unable to grasp the fundamentals of the non-linear editing process. But this argument ignores the strengths Corey possessed that were considered by management and resulted in his retention. Corey had more experience than Mynatt; he had higher performance ratings; he had a strong customer base at Y-12, whereas Mynatt's customer base at K-25 was leaving; Corey had higher technical skills; and he was the department's chief engineer and maintained the equipment. When challenging an employer's explanation for termination, Mynatt cannot prove pretext merely by asserting that a better business decision could have been made. *Blackwell v. Sun Elec. Corp.,* 696 F.2d 1176, 1179 (6th Cir. 1983). The plaintiff may not simply substitute his business judgment for that of the defendant. *Rowan,* 360 F.2d at 550.

-21-

In order to demonstrate pretext with regard to the relative qualifications between Mynatt and any other employee, he must establish that LMES' business judgment "was so ridden with error that defendant could not have honestly relied upon it." *In Re: Lewis,* 845 F.2d 624, 633 (6th Cir. 1988). The record supports LMES' contention that IMS followed the RIF guidelines and selected Mynatt for the reasons stated in the layoff comparison form, which have nothing to do with Mynatt's race. Mynatt has failed to raise a genuine issue of material fact that his selection for the RIF was anything other than a legitimate business decision. Accordingly, LMES is entitled to judgment as a matter of law on his claim of discriminatory discharge.

<u>Disparate Treatment</u>

Mynatt contends that he was discriminated against with respect to his compensation. To establish a *prima facie* case of discrimination in compensation, Mynatt must demonstrate that LMES paid him lower wages than it paid to employees outside the protected class, for equal work. *Corning Glass Works v. Brennan,* 417 U.S. 188, 195 (1974). It is undisputed that Mynatt is a member of a protected class, and LMES concedes that Mynatt received lower wages than Walter Corey, a white employee. Mynatt argues that he and Corey were equal; they had the same job title and performed the same job duties, yet Corey was paid more. However, it is not unlawful for an employer to pay employees holding the same position different salaries if the decision is based on factors other than race or on a bona fide seniority or merit system, provided the differences are not

-22-

the result of an intention to discriminate because of race, color, religion, sex, or national origin. 42 U.S.C. § 2000e-2(h).

The record shows that under LMES' compensation plan, the employee's position in terms of the mid-point of the salary range for the position, the employee's performance rating, and the time since the employee's last increase, were factors that resulted in the increases and the differences in Corey's pay and Mynatt's pay. Mynatt came to the department in 1984 as a weekly salaried employee. He became a Salary Grade 3 employee in 1990 as a Producer/Director. Corey entered the department in 1981 and in 1982 became a monthly salaried employee. He became a Salary Grade 3 employee in 1989 as a Producer/Director. From 1990 forward, Corey and Mynatt were in the same position and salary grade. The difference in their salaries was not because of race but because of the different positions they had held before 1990 and of how the race neutral compensation plan impacted their respective salary increases thereafter. Moreover, although they performed the same kind of work, Corey received five "consistently exceeds" ratings and three "consistently meets" ratings, while Mynatt received one "consistently exceeds" and seven "consistently meets" performance ratings during the eight years they were both at Salary Grade 3. Corey's superior performance and time in grade were factors in the salary difference that were non-discriminatory. Accordingly, Mynatt has failed to show that his compensation was based on discriminatory factors, and LMES will be granted summary judgment as to that claim.

-23-

Second, Mynatt contends that he was subjected to discriminatory treatment on account of his race after he received the RIF notice. At his termination meeting, Mynatt states he did not exhibit any hostility. However, after the meeting, he was met by armed guards, ordered to report to the plant psychologist, stripped of his LMES badge, and then escorted from the premises by the armed guards, without any opportunity to collect his personal belongings. Immediately thereafter, LMES posted his picture at its security portals and in the parking lot of the plant.

The TAT was confronted with a concern expressed by Buck of possible violence, reported in writing and orally. Buck identified Mynatt as the concern and told Dr. Friedman of several incidents of threatening behavior toward coworkers. Buck did not base his concern on a single act or only on events that happened some years ago. The record shows there was a frequency to Mynatt's outbursts which was made known to Dr. Friedman. Management met with Dr. Friedman and responded according to company policy. Mynatt argues the TAT should have investigated further, however, Sixth Circuit precedent does not "require that the decisional process used by the employer be optimal or that it left no stone unturned. Rather, the key inquiry is whether the employer made a reasonably informed and considered decision before taking an adverse employment action." *Smith v. Chrysler Corp.,* 155 F.3d 799, 807 (6th Cir. 1998). An investigation is sufficient if the employer "reasonably relied on the particularized facts that were before it at the time the decision was made." *Id.*

Based on the record as submitted by the parties, the court concludes that LMES reasonably relied on particularized facts in making a reasonably informed and considered decision that Mynatt posed a potential threat to employees of the plant.  Mynatt has not presented sufficient evidence such that a factfinder could find that LMES' given reasons for its actions were pretextual, nor has he met the ultimate burden in this case of presenting sufficient facts to show that he was the victim of intentional race-based discrimination.  Thus, LMES is entitled to judgment as a matter of law on Mynatt's claim of discriminatory treatment after he received the RIF notice.

## **Conclusion**

For the reasons stated above, the court finds that defendant Lockheed Martin Energy Systems is entitled to  judgment as a matter of law on Mynatt's claims of discrimination under Title VII and 42 U.S.C. § 1981.  Accordingly, defendant's motion for summary judgment [Doc. 7] will be granted,  and this action will be dismissed.

**ENTER:**

_____s/ Thomas W. Phillips_____
United States District Judge